IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| S.D. ALEXANDER, INC.,<br>a Florida corporation, | ) | C.A. No. 04-312-KAJ |
| | ) | |
| Plaintiff, | ) | **PUBLIC VERSION** |
| | ) | |
| v. | ) | |
| | ) | |
| mBLOX, INC.,<br>a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX IN SUPPORT OF
DEFENDANT MBLOX, INC.'S OPENING BRIEF
IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Matthew F. Lintner (#4371)
Amy A. Quinlan (#3021)
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19899
(302) 888-6800
Attorneys for Defendant mBlox, Inc.

OF COUNSEL

COOLEY GODWARD LLP
Craig Daniel
One Maritime Plaza
20th Floor
San Francisco, CA 94111-3580
(415) 693-2000

Dated: April 22, 2005
Public Version Dated: April 29, 2005

# Table of Contents

**Affidavit of Thomas Hasler**.........................................................................................A1

Plaintiff's First Amended Complaint dated May 17, 2004, including

a true and correct copy of the Non-Exclusive Sales Representative

Agreement.................................................................................................... A6

Master Service Agreement entered between MobileSys, Inc. and

9 Squared, Inc. on May 29, 2003. ................................................................ A46

Master Services Agreement entered between mBlox, Inc. and

9 Squared, Inc. on November 29, 2004. ....................................................... A52

Network Services Agreement entered between MobileSys, Inc. and

9 Squared, Inc. on May 29, 2003. ................................................................ A75

SMS Services Agreement entered between mBlox, Inc. and

Atlas Telecom Mobile on August 14, 2003. ................................................. A78

SMS Services Agreement entered between mBlox, Inc. and

Atlas Telecom Mobile on January 29, 2004. ................................................ A88

Master Agreement entered between MobileSys, Inc. and

Clickatell (PTY) Ltd on April 8, 2003........................................................... A98

Network Services Agreement entered between MobileSys, Inc. and

Clickatell (PTY) Ltd on April 8, 2003........................................................... A102

SMS Services Agreement entered between mBlox Limited and

Clickatell (PTY) Ltd on April 10, 2003......................................................... A105

Network Services Agreement entered between MobileSys, Inc.

and Mobyt on June 19, 2003......................................................................... A112

SMS Services Agreement entered between mBlox Limited, and

SMS.ac, Inc. on July 8, 2003. ...................................................................... A120

SMS Services Agreement (MT & MO) entered between mBlox

Limited and SMS.ac, Inc. on August 7, 2003................................................ A124

SMS Services Agreement (MT & MO) entered between mBlox

Limited and SMS.ac, Inc. on November 10, 2003.......................................... A136

Master Service Agreement entered between MobileSys, Inc.

and Yellow Pepper, Inc. on August 5, 2003. ................................................ A150

Network Services Agreement entered between MobileSys, Inc.
and Yellow Pepper, Inc. on August 5, 2003. ................................... A156
UK Premium SMS Services Agreement Unique Short-Code entered between
mBlox Limited and Yellow Pepper, Inc. on January 26, 2004. ..................... A160
Master Services Agreement entered between mBlox, Inc. and Zingy, Inc.
on February 25, 2004. ................................................... A172
SMS Services Agreement entered between mBlox Inc. and Zingy, Inc.
on October 31, 2003 ..................................................... A178
Service Addendum entered between mBlox and Zingy, Inc. on
February 25, 2004. ...................................................... A188
**Affidavit of Amy A. Quinlan** ............................................ A190
Excerpts of the Deposition of Scott Alexander given on
April 18-19, 2005 ....................................................... A192

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

S.D. ALEXANDER, INC.,          )
a Florida corporation,          )
                                )
                    Plaintiff,  )
                                )
          v.                    )        C.A. No. 04-312-KAJ
                                )
mBLOX, INC.,                    )
a Delaware corporation,         )
                                )
                    Defendant.  )

## **AFFIDAVIT OF THOMAS HASLER**

STATE OF CALIFORNIA    )
                       ) SS.
COUNTY OF              )
SANTA CLARA            )

1.      I am the comptroller for the defendant in the above-captioned action.

2.      Attached as Exhibit A is a true and correct copy of the Plaintiff's First Amended Complaint dated May 17, 2004, including a true and correct copy of the Non-Exclusive sales Representative Agreement.

3.      Attached as Exhibit B is a true and correct copy of the Master Service Agreement entered between MobileSys, Inc. and 9 Squared, Inc. on May 29, 2003.

4.      Attached as Exhibit C is a true and correct copy of the Master Services Agreement entered between mBlox, Inc. and 9 Squared, Inc. on November 29, 2004.

5.      Attached as Exhibit D is a true and correct copy of the Network Services Agreement entered between MobileSys, Inc. and 9 Squared, Inc. on May 29, 2003.

6.      Attached as Exhibit E is a true and correct copy of the SMS Services Agreement entered between mBlox, Inc. and Atlas Telecom Mobile on August 14, 2003.

7.      Attached as Exhibit F is a true and correct copy of the SMS Services Agreement entered between mBlox, Inc. and Atlas Telecom Mobile on January 29, 2004.

8.      Attached as Exhibit G is a true and correct copy of the Master Agreement

**A1**

entered between MobileSys, Inc. and Clickatell (PTY) Ltd on April 8, 2003.

9.     Attached as Exhibit H is a true and correct copy of the Network Services Agreement entered between MobileSys, Inc. and Clickatell (PTY) Ltd on April 8, 2003.

10.     Attached as Exhibit I is a true and correct copy of the SMS Services Agreement entered between mBlox Limited and Clickatell (PTY) Ltd on April 10, 2003.

11.     Attached as Exhibit J is a true and correct copy of the Network Services Agreement entered between MobileSys, Inc. and Mobyt on June 19, 2003.

12.     Attached as Exhibit K is a true and correct copy of the SMS Services Agreement entered between mBlox Limited, and SMS.ac, Inc. on July 8, 2003.

13.     Attached as Exhibit L is a true and correct copy of the SMS Services Agreement (MT & MO) entered between mBlox Limited and SMS.ac, Inc. on August 7, 2003.

14.     Attached as Exhibit M is a true and correct copy of the SMS Services Agreement (MT & MO) entered between mBlox Limited and SMS.ac, Inc. on November 10, 2003.

15.     Attached as Exhibit N is a true and correct copy of the Master Service Agreement entered between MobileSys, Inc. and Yellow Pepper, Inc. on August 5, 2003.

16.     Attached as Exhibit O is a true and correct copy of the Network Services Agreement entered between MobileSys, Inc. and Yellow Pepper, Inc. on August 5, 2003.

17.     Attached as Exhibit P is a true and correct copy of the UK Premium SMS Services Agreement Unique Short-Code entered between mBlox Limited and Yellow Pepper, Inc. on January 26, 2004.

18.     Attached as Exhibit Q is a true and correct copy of the Master Services Agreement entered between mBlox, Inc. and Zingy, Inc. on February 25, 2004.

19.     Attached as Exhibit R is a true and correct copy of the SMS Services Agreement entered between mBlox Inc. and Zingy, Inc. on October 31, 2003.

20.     Attached as Exhibit S is a true and correct copy of the Service Addendum entered between mBlox and Zingy, Inc. on February 25, 2004.

_Thomas Hasler_

    SWORN TO AND SUBSCRIBED before me, a Notary Public, this 21st day of April, 2005.

CYNTHIA E. KING
Commission # 1317559
Notary Public - California
Santa Clara County
My Comm. Expires Aug 12, 2005

_Notary Public_

1138894

A3

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**

State of California

County of _Santa Clara_ } ss.

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

_____
Signature of Document Signer No. 1

_____
Signature of Document Signer No. 2 (if any)

Subscribed and sworn to (or-affirmed) before me on this

_21st_ day of _April_, _2005_, by
Date                    Month              Year

(1)_____Thomas Marcus Hasler_____,
Name of Signer

☐ Personally known to me
☒ Proved to me on the basis of satisfactory evidence
to be the person who appeared before me (.) (,)
(and

(2)_____,
Name of Signer

☐ Personally known to me
☐ Proved to me on the basis of satisfactory evidence
to be the person who appeared before me.)

_Cynthia E. King_
Signature of Notary Public

CYNTHIA E. KING
Commission # 1317559
Notary Public - California
Santa Clara County
My Comm. Expires Aug 12, 2005

Place Notary Seal Above

——— **OPTIONAL** ———

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*
**Further Description of Any Attached Document**

Title or Type of Document: _Affidavit of Thomas Hasler_

Document Date: _4/21/05_     Number of Pages: _3_

Signer(s) Other Than Named Above: _____

RIGHT THUMBPRINT
OF SIGNER #1
Top of thumb here

RIGHT THUMBPRINT
OF SIGNER #2
Top of thumb here

© 2004 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5910   Reorder: Call Toll-Free 1-800-876-6827

A4

# Exhibit A

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2004 MAY 17  AM 11: 30

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SD ALEXANDER, INC., <br> a Florida corporation, | : <br> : <br> : | CIVIL ACTION NO. 04-312 <br> JURY TRIAL DEMANDED |
| Plaintiff, | : <br> : | |
| v. | : <br> : | |
| mBLOX, INC., formerly <br> MOBILESYS, INC., <br> a Delaware corporation, | : <br> : <br> : | |
| Defendant. | : <br> : | |

## FIRST AMENDED COMPLAINT[1]

### PARTIES

1.  Plaintiff, SD Alexander, Inc. is a corporation organized and existing under the laws of the State of Florida, having at all times relevant and material a principal place of business at 370 Pinellas Bayway, No.G, Tierra Verde, Florida 33715 (herein "SD Alexander" or "plaintiff").

2.  At all times relevant and material, Alexander acted by and through its principal, Scott Alexander ("Alexander"), an individual and citizen of the State of Florida, and further acted

---

[1]Because no responsive pleading has been served, the Complaint is amended as a matter of right pursuant to Rule 15(a) of the Federal Rules of Civil Procedure.  The First Amended Complaint contains Exhibit "A".  Also, non-substantive amendments have been made to ¶ 50.

1

**A6**

by and through its duly authorized officers, agents, servants and employees, who acted within the scope of their agency and/or authority and within the course of SD Alexander's business, mission and affairs.

3.   Defendant, mBlox, Inc., formerly incorporated and known as MobileSys, Inc. at the time plaintiff contracted with defendant as specifically set forth hereinafter, is a corporation organized and existing under the laws of the state of Delaware, having at all times relevant and material a place of business and registered agent at 2711 Centerville Road, Wilmington, Delaware 19808 ("mBlox").

4.   At all times relevant and material, mBlox acted by and through its duly authorized officers, agents, servants and employees, who acted within the scope of their agency and/or authority and within the course of mBlox's business, mission and affairs.

## JURISDICTION AND VENUE

5.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1), in that there is complete diversity of citizenship between the plaintiff and defendant, and the matter in controversy exceed $75,000 exclusive of interest and costs.

6.   Venue is proper in this Delaware court as the non-exclusive sales representative agreement between the parties,

A7

more fully identified and described hereinafter, contains a
provision stating: "[a]ny dispute of any kind arising out of or
relating to the Agreement shall be brought exclusively in the
Delaware State courts.  The United Nations Convention on
Contracts for the International Sales of Goods shall not apply to
this Agreement." See, ¶22, this complaint.  Further, mBlox's
registered office and place of business sits in this vicinage.

### FACTS RELEVANT TO ALL COUNTS

7.  At all times relevant and material, mBlox was and held
itself out to be one of the world's leading wireless messaging
services provider, providing a global wireless data network as a
"mobile aggregator", offering a secure, reliable delivery of data
worldwide to virtually any devise, including mobile telephones,
pagers, and personal handheld devices (PDAs).

8.  At all times relevant and material, mBlox's business
consisted of products and services including, *inter alia,*
international and US-carrier quality transport network, message
(short message service ("SMS")), text messaging and paging
delivery, enterprise messaging software, and integration and
professional services relating thereto, utilizing over 800 global
carrier connections worldwide.

9.  To further promote itself in the marketplace and
compete for business, mBlox held itself out as offering a world-

3

**A8**

class infrastructure bottomed upon network reliability and
security through several major mBlox "gateways", technical
wireless expertise, and advanced monitoring and network
operations service to deliver the most advanced customer support
in the SMS industry.

    10.  Plaintiff, from the standpoint of initiating a business
relationship with mBlox, was attracted to mBlox's products and
services, particularly its SMS worldwide network and global
carrier connections as a mobile aggregator, all as a desired
product for plaintiff's current and prospective wireless content
and SMS gateway clients.

**Facts leading up to the Sales Representative Agreement**

    11.  In early March, 2003, plaintiff's principal, Scott
Alexander was personally introduced to mBlox through his contacts
in the telecommunications industry, to explore a sales
representative position with mBlox on a commissions basis.

    12.  At that time, plaintiff presented with over twenty
years experience in the development and support of complex
network and telecommunications systems including mobile/wireless
data, products and services, contracts, marketing and sales as a
systems engineer, sales director, and product and customer
support manager for various prominent communications companies.

**A9**

13.  On or about March 11, 2003 plaintiff had a face-to-face interview in New Orleans with Craig Levy (Vice-President of Sales and Head of Sales Americas for MobileSys) and Ray Stephens (Vice-President of Marketing for MobileSys) to discuss terms and conditions of a sales representative agreement which both parties were interested in pursuing.

14.  Plaintiff advised Craig Levy he was particularly interested in MobileSys' worldwide wireless SMS traffic capabilities as an aggregator, since MobileSys had worldwide mobile operators under contract with capabilities to service plaintiff's clients' worldwide SMS traffic.

15.  Plaintiff, at the special request of mBlox during the course of his negotiations with mBlox, on March 27, 2003, and March 31, 2003, provided mBlox with a confidential list of his mobile data content and aggregator clients with whom plaintiff was in a position to introduce to sign with a mobile aggregator such as mBlox, including, among others, Fidelity Investments, 9Square.com, Clickatell, Mobile Elements, Over-the-Air Wireless and nReach.com (collectively the "pre-agreement prospects").

16.  All of plaintiff's clients (including pre-agreement prospects) had a present need and desire to use mBlox's international traffic routes, a fact plaintiff advised Craig Levy, Ray Stephens and Jay Emmet (President-mBlox Americas) early on in the negotiations, inasmuch as all of plaintiff's clients

5

**A10**

were routing SMS traffic worldwide, and this international SMS
traffic (both basic and premium) was a contemplated present and
future source of plaintiff's commissions.

17.   Plaintiff, in the course of his disclosure of pre-
agreement prospects in March, 2003, further disclosed directly to
the prospects and other clients, confidential information in the
form of pricing for multiple international destinations and US-
based mobile carriers available through mBlox.

18.   This disclosure, at the request and/or acquiescence of
mBlox executives, was plaintiff's effort to demonstrate his
ability to bring his clients and prospects under a formal
contract with mBlox and to assist mBlox in determining margins on
SMS traffic and, ultimately, commission rates and other contract
terms to plaintiff.

19.   During the course of plaintiff's negotiations for a
sales representative agreement with mBlox, on various dates (to
be identified in discovery) in March and April, 2003, Craig Levy,
Ray Stephens, Jay Emmet and Chip Hoffman (CEO of MobileSys) all
expressly represented to plaintiff that his sales territory under
the anticipated sales representative agreement, would be
unlimited and *worldwide* in scope.

20.   The fact of an unlimited worldwide territory was a
material and bargained-for provision of plaintiff's agreement and
specifically agreed to by mBlox, and ultimately along with other

6

**A11**

equally important provisions, became a part of plaintiff's final sales representative agreement with mBlox.

21.   During the course of plaintiff's negotiations over his agreement with mBlox, on various dates (to be identified in discovery) in March and April, 2003, Craig Levy, Ray Stephens and Jay Emmet all expressly represented to plaintiff that all of his pre-agreement prospects and customers within the worldwide sales territory under the anticipated agreement, and all commissions generated to plaintiff thereon, would be protected and held inside mBlox as confidential for the benefit of plaintiff.

**The Non-Exclusive Sales Representative Agreement**

22.   On April 1, 2003, in express reliance, in part, on the above representations, statements and positions of mBlox, plaintiff entered into a written Non-Exclusive Sales Representative Agreement with mBlox (known as MobileSys, Inc. at the time), a true and correct copy of which is attached hereto, made a part hereof and marked Exhibit "A" (the "Agreement").

23.   Under the Agreement, in consideration of each party's desire to affiliate with the other, plaintiff was appointed a non-exclusive (to mBlox) independent sales representative in the designated territory (defined below) for purposes of selling and providing certain administrative services in respect to mBlox products and services.

7

24.  At the time of signing, both parties expressly understood and agreed the value of plaintiff's prospective customer contracts signed in the United States for either US or worldwide access would not be realized with mBlox in the short term, but that the value of the contracts would increase over time.

25.  In consideration for current performance and future anticipated values of the contracts, plaintiff committed to mBlox his total time, resources, knowledge, contacts and expertise in the telecommunications industry, particularly as regards international mobile content providers in SMS, as the parties specifically bargained for.

26.  At the outset of the Agreement, products known as "add-ons"– namely, premium SMS traffic and message origination ("MO") (as opposed to message termination, ("MT")) and different territories for MT with a particular carrier as the case may be, were developing events, particularly in the US.

27.  The parties expected plaintiff would build mBlox's overall SMS market on an international basis and be paid under an agreed commission structure that would increase in amount as products and services, and ultimately, sales expanded in both the international and US market.

28.  The term of the Agreement was from May 15, 2003 to May 15, 2004.  Termination could occur earlier, but only on ninety

8

**A13**

(90) days notice if all outstanding sales representative agreements with other sales representatives were terminated and mBlox offered a new or amended form of sales representative agreement to all representatives, although the commissions and revenue stream was to continue into the future.

29.    Under the Agreement, plaintiff's primary area of sales was mBlox's network access worldwide and related products and services (defined below) throughout a territory expressly understood by the parties to be worldwide and without limitation (herein "Territory").

30.    Plaintiff further agreed as a material provision of the Agreement, to provide mBlox and plaintiff's customers, jointly, with account management to each of plaintiff's customers contracting directly with mBlox for network access, including contract negotiation, problem solving, escalation, service, pricing and client relations.

31.    Under the Agreement, products and services were specifically defined as "products, services, and any related service parts and accessories created, manufactured and/or sold by [mBlox] as follows: MobileSys MX software, partner solutions software, and associated invoiced message traffic delivered through the MobileSys messaging network." See, Agreement, ¶4; Exhibit "A".

9

**A14**

32.    During the term of the Agreement, mBlox was required to pay plaintiff for all services provided or expenses incurred by plaintiff, commissions as a percentage of Net Sales of each separate order for delivery of products and services into the Territory that resulted directly from the efforts of plaintiff and which order mBlox accepted for shipment or delivery into the Territory, known as a "Qualified Sale".

33.    Under the Agreement, payment was to be made in U.S. dollars as follows: messages at 15% of monthly invoice (mBlox invoice to plaintiff's customers under contract with mBlox), Software Products paid at 20% invoice (at resale of MobilSys or any partner solutions specified in the Agreement), after charge-backs, if any.

34.    Under the Agreement, commissions were to be paid monthly, based on invoices on Qualified Sales, within forty-five (45) days after the invoice was to have been sent to the Qualified Sales Customer, with a copy of each invoice provided to plaintiff along with the commission payment.

35.    Under the Agreement, "Qualified Sales" consisted of each separate order for delivery of Products and Services into the Territory that resulted directly from the efforts of plaintiff and which order [mBlox] accepted for shipment into the Territory.

**A15**

**Defendant's deception towards plaintiff surrounding the MobileSys acquisition of mBlox**

36. On or about June 24, 2003, MobileSys, Inc. acquired MBlox, Inc., a United Kingdom ("UK") mobile wireless aggregator having minimal presence in the United States, and retained and continued to trade under and/or use the name MBlox, Inc. worldwide, later changed to mBlox, Inc.

37. Plaintiff, during the period of time leading up to his Agreement and thereafter, became aware through his discussions with Craig Levy, Ray Stephens and Jay Emmet, of MobileSys' intended acquisition of mBlox.

38. Plaintiff recognized, and mBlox executives expressly championed to plaintiff, the acquisition would create one of the largest SMS gateway providers in the world, with international SMS services and products virtually unmatched in the industry, which further induced plaintiff to enter into his Agreement, and plaintiff relied.

39. During the course of negotiations within the thirty day period leading up to the signing of the Agreement, as plaintiff became aware of the pending acquisition, he inquired of mBlox executives, particularly Craig Levy and Jay Emmet, of what impact, if any, the acquisition would have on plaintiff's Agreement.

40. Plaintiff received no response to his inquiries from mBlox, although he expected mBlox to respond.

11

**A16**

41. Contemporaneous with the final negotiations over the Agreement and during the period leading into the mBlox acquisition, plaintiff attended a high level executive sales meeting with Craig Levy, Jay Emmet and Chip Hoffman all in attendance in Atlanta, Georgia.

42. At the meeting, Plaintiff raised the issue of what impact, if any, the intended acquisition would have on his Agreement. In response, all three mBlox officers expressly assured plaintiff his worldwide territory and customers and accounts would remain unchanged and protected post-acquisition.

43. On April 9, 2003, after the Agreement was drafted but before it was signed, plaintiff inquired of Craig Levy through an email: "[o]nce the Agreement is signed, what will the status be after the merger, and does this need to be covered in the Agreement?"

44. Although Plaintiff received no direct response to his inquiry from Craig Levy, he again was verbally assured by Levy and Emmet, that his Territory and all of his clients, accounts and leads would be protected post-acquisition.

45. Shortly thereafter, Craig Levy was fired and mBlox appointed John Glennon, formerly an mBlox sales representative and manager in the UK, the new Vice-President of Sales for mBlox working out of Atlanta, Georgia.

12

**A17**

46.   Beginning on or about April 15, 2003, in response and reliance upon Craig Levy's and Jay Emmet's specific statements to plaintiff that all customers and leads would be protected post-acquisition, plaintiff placed all confidential sales information about his customers, leads and prospects into a protected data base called "Upshot".

47.   At or about the same time of Upshot, mBlox established SalesLogix as the protected data base for its European representatives' confidential sales information, where all US sales representatives were required to participate and, in turn, receive access, as mBlox executives explained, to assist mBlox in its effort to protect *all* sales representatives' accounts and leads.

48.   Plaintiff, beginning about July 8, 2003 and continuing through late October, 2003, repeatedly requested access to the SalesLogix data base since he had fully complied with Upshot; his requests were repeatedly met with resistence and/or non-committal answers by John Glennon such as "we're working on it", but plaintiff was never permitted access.

49.   Plaintiff, despite his demands, was the *only* sales representative denied access to SalesLogix; throughout his contract tenure, plaintiff remained completely shut out of mBlox's European sales representatives' account data.

A18

50. mblox's treatment of plaintiff under Upshot and SalesLogix was deceptive, and contrary to mBlox's new, self-propagating internal sales policies which cropped up post-acquisition, as a moving target designed to cause a deterioration in plaintiff's ability to perform his Agreement, and to harm plaintiff.

51. John Glennon, and all mBlox executives, knew prior to the acquisition that the acquisition would directly impede plaintiff's Territory and commissions under the Agreement; rather than disclose mBlox's plans to plaintiff, mBlox utilized the acquisition as a pretext, specifically designed to lure plaintiff into his Agreement and then siphon off accounts and commissions through unilateral changes to plaintiff's Territory and Agreement.

**Deceptive acts and conduct of mBlox precipitating mBlox's termination of plaintiff's Sales Representative Agreement**

52. On or about July 11, 2003, plaintiff learned his client, Clickatell, had signed a mobile aggregator contract with mBlox that, upon information and belief, existed pre-acquisition with mBlox for the same or similar products and services as MobileSys, with all traffic passing through a separate mBlox gateway originating in the UK.

53. When plaintiff inquired of the impact (if any) on his commission stream as the result of Clickatell's worldwide traffic

14

potentially passing through two mBlox gateways, John Glennon told plaintiff that his commissions would be paid on *all traffic* passing through mBlox's US gateway, which was unacceptable to plaintiff because it would place him in direct competition with an mBlox sales representative in the UK over Clickatell traffic.

54. On July 15, 2003, when plaintiff again pressed mBlox for clarity on his commissions on Clickatell's worldwide traffic post-acquisition, Jay Emmet responded that plaintiff would receive commissions *only* on traffic through the mBlox US gateway, which was directly contrary to plaintiff's Agreement and performance with mBlox from the inception of the Agreement.

55. On or about August 25, 2003, at the specific request of John Glennon, plaintiff again furnished mBlox with his current list of all customers and leads, in exchange for mBlox's assurances to plaintiff (and all sales representatives) that plaintiff's customers and leads would be protected both for Territory and commission stream, under the Agreement post-acquisition.

56. By September 11, 2003, mBlox, without explanation, had failed to protect nReach as plaintiff's prospect and customer for commissions through the international SMS Gateway; to avoid paying commissions mBlox intentionally diverted nReach and plaintiff's commission stream away from plaintiff and, to date, has failed to pay plaintiff commissions on nReach SMS traffic.

15

**A20**

57. In a similar fashion, mBlox failed to protect plaintiff's clients, MonsterMob, Jippii, Downplay, Inc. (Jippii-US), Mobile Streams, Digital Rum and Moviso; by December 1, 2003, plaintiff learned for the first time from John Glennon and Jay Emmet that, despite their specific assurances that plaintiff's customers were protected, mBlox's permanently diverted these accounts and commissions away from plaintiff.

58. As of this date, upon information and belief, Clickatell, Jippii, Downplay, nReach, MonsterMob, Mobile Streams, Digital Rum and Moviso and other carriers directed to mBlox by plaintiff, are all using mBlox's international gateway for SMS traffic, including premium SMS traffic, as a direct result of plaintiff's efforts, in open derogation of plaintiff's rights under the Agreement.

59. On September 30, 2003, John Glennon abruptly and unilaterally set down new "sales rules" at mBlox, which directly affected and reduced plaintiff's Territory under the Agreement to only the United States, Canada and Australia, demanding that plaintiff limit his sales to these areas and "stay out of" lucrative territories of Europe, South Africa and the Middle East where plaintiff's sales prospects and efforts were long-burgeoning.

60. By late fall of 2003, plaintiff's performance under the Agreement, both for new accounts and near term accounts and

16

A21

account management, notwithstanding the change in "sales rules" and mBlox intentional diversion of plaintiff's accounts and commission stream, was exceptional and exceeded mBlox's expectations.

61. Upon information and belief, by December 13, 2003 mBlox was demanding all Clickatell's European SMS traffic flowing through the US gateway – a commission generating event to plaintiff – be rerouted through the mBlox UK gateway, a fact which mBlox intentionally failed to disclose to plaintiff.

62. Mblox's attempt to reroute the Clickatell traffic, notwithstanding the Agreement and mBlox's express representations to the contrary, like mBlox's stripping of plaintiff's sales territory, was a scheme and artifice post-acquisition to increase Mlbox's profits by cutting off plaintiff's commission stream from all non-US based Clickatell traffic.

63. As mBlox executed its scheme and artifice to divert the SMS traffic, plaintiff was left to twist slowly, hapless to watch his lucrative commission stream vanish along with his control and management of his valuable customers whom he arduously encouraged, successfully, to sign with mBlox.

64. While plaintiff continued to work under the Agreement, although he disputed the unilateral changes which had a deleterious effect on his business, mBlox continued its vitriolic campaign to carve up the Agreement, cut plaintiff out of his

17

commissions, and steal his accounts.

65. On Friday, December 15, 2003, mBlox announced the availability for the first time of its USA Premium SMS ("PSMS") product, which was a highly lucrative market for SMS mobile services including microbilling offered to all mBlox customers at premium rates under long-term contract.

66. The opening and timing of PSMS market in the US was precisely as plaintiff and mBlox discussed at the outset of the Agreement, which the parties had determined would be a strong commission generating event for plaintiff.

66. Premium SMS was lucrative for commissions on Europe and South Africa SMS traffic (which mBlox stripped away from plaintiff), but a new and anticipated event in the US; however, plaintiff was finally poised to begin to enjoy PSMS commissions on US traffic, as an "add-on" sales event under the Agreement.

67. On Monday, December 16, 2003 mBlox abruptly and without warning, terminated in writing plaintiff's Agreement with mBlox, effective immediately.

68. Under the termination, no new sales representative agreement was offered to plaintiff, and nothing was disclosed about consideration or treatment of other mBlox sales representatives as regards the termination of the Agreement.

69. To date, despite demand, mBlox has failed, neglected and refused to account to plaintiff for his customers, his

18

accounts, copies of his invoices to his accounts, and his active and prospective account leads in near term sales as of the date of termination through today's date.

70.  To date, despite demand, mBlox has failed, neglected and refused to pay plaintiff his commissions accrued, due and owing under the Agreement, in open and notorious derogation of plaintiff's rights under the Agreement.

71.  To date, despite demand, mBlox has failed, neglected and refused to account and/or set aside a reserve for the benefit of plaintiff, or pay plaintiff, for all future commissions on plaintiff's accounts and leads in progress that closed, in derogation of plaintiff's rights under the Agreement.

72.  To date, despite demand, mBlox has converted from plaintiff, and adapted and acquired for its own use and ownership, all of plaintiff's customers and accounts, including active and prospective account leads in progress on the date of termination, all in continuing open and notorious derogation of plaintiff's rights under the Agreement.

## COUNT I

### Plaintiff v. mBlox, Inc.
### [Fraud in the Inducement]

73.  Plaintiff incorporates herein by reference paragraphs 1 through 72, inclusive, as though the same were more fully set forth at length.

19

**A24**

74. Defendant, mBlox, acting and/or failing to act through one or more statements, representations, omissions of material fact, and/or conduct as set forth above, prior to and at the time the Agreement was signed and performance thereunder began, did promise and covenant to act and perform in accordance therewith, as regards plaintiff's commissions, customers, prospects and leads and accounts, and other intangible rights.

75. The aforesaid statements, representations, conduct and/or omissions of material fact were made by mBlox with the intent to deceive and induce plaintiff to enter into and perform under the Agreement, with actual knowledge and/or reason to know and expect plaintiffs would rely and act upon same, and mBlox gained an advantage.

76. These statements, representations and/or omissions of material fact were false when made, materially misleading and/or made by mBlox with reckless disregard for the truth, and plaintiff reasonably relied.

77. As a direct and proximate result of the foregoing, plaintiff sustained damages.

78. In the alternative, mBlox advised plaintiff of an important business matter and plaintiff reasonably relied to its detriment, and mBlox gained an advantage.

79. The acts and conduct, statements and representations of mBlox were intentional and wilful, and made with malice and/or

20

reckless disregard for plaintiff's rights and its property, knowing or having reason to know to a high degree of probability that plaintiff would suffer harm and damages as a result thereof.

WHEREFORE, plaintiff, SD Alexander, Inc. demands judgment in its favor and against defendant, mBlox, Inc., formerly MobileSys, Inc., in an amount in excess of $75,000 exclusive of interest and costs, together with incidental and/or consequential damages, exemplary and/or punitive damages, interest, costs of suit, attorneys' fees and related costs as permitted by the Agreement, and such other relief as the court deems just.

## COUNT II

### Plaintiff v. mBlox, Inc.
### [Fraud and Deceit]

80. Plaintiff incorporates herein by reference paragraphs 1 through 79, inclusive, as though the same were more fully set forth at length.

81. Defendant, mBlox, acting and/or failing to act through one or more statements, representations, omissions of material fact, and/or conduct as set forth above, after the Agreement was signed and during the course of the parties' performance thereunder, did promise and covenant to act and perform in accordance therewith, as regards plaintiff's commissions, customers, prospects and leads, accounts and other tangible and intangible rights.

21

A26

82.   The aforesaid statements, representations, conduct and/or omissions of material fact were made by mBlox with the intent to deceive and induce plaintiff to continue to perform fully under the Agreement, to deliver valuable customers and leads to mBlox under plaintiff's agreement not to compete with mBlox, and provide a full range of account management support and services and other services to his accounts, all to the great benefit of mBlox, with actual knowledge and/or reason to know and expect plaintiff would rely and act upon same, and mBlox gained an advantage.

83.   These statements, representations and/or omissions of material fact were false when made, materially misleading and/or made by mBlox with reckless disregard for the truth, and plaintiff reasonably relied.

84.   As a direct and proximate result of the foregoing, plaintiff sustained damages.

85.   In the alternative, mBlox advised plaintiff of an important business matter and plaintiff reasonably relied to its detriment, and mBlox gained an advantage.

86.   The acts and conduct, statements and representations of mBlox were intentional and wilful, and made with malice and/or reckless disregard for plaintiff's rights and its property, knowing or having reason to know to a high degree of probability that plaintiff would suffer harm and damages as a result thereof.

22

A27

interest, costs of suit, attorneys' fees and related costs as permitted by the Agreement, and such other relief as the court deems just.

**COUNT IV**

Plaintiff v. mBlox, Inc.
[Conversion]

91. Plaintiff incorporates herein by reference paragraphs 1 through 90, inclusive, as though the same were more fully set forth at length.

92. Defendant, mBlox, Inc., acting and/or failing to act as aforesaid, violated plaintiff's rights and interest in its property.

93. Defendant, mBlox, Inc. acting and/or failing to act as aforesaid, has wrongfully converted to its own use and enjoyment plaintiff's personal property, for its own selfish monetary gain and advantage, to the great and continuing harm and detriment of plaintiff.

94. As a result of the foregoing wrongful acts, conduct and/or omissions of defendant, mBlox, plaintiff has sustained damages.

95. The acts and conduct, and statements and representations of mBlox were intentional and wilful, and made with malice and/or reckless disregard for plaintiff's rights and its property, knowing or having reason to know to a high degree of probability that plaintiff would suffer harm and damages as a

24

A28

WHEREFORE, plaintiff, SD Alexander, Inc. demands judgment in its favor and against defendant, mBlox, Inc., formerly MobileSys, Inc., in an amount in excess of $75,000 exclusive of interest and costs, together with incidental and/or consequential damages, exemplary and/or punitive damages, interest, costs of suit, attorneys' fees and related costs as permitted by the Agreement, and such other relief as the court deems just.

## COUNT III

Plaintiff v. mBlox, Inc.
[Breach of Contract – Express Terms]

87. Plaintiff incorporates herein by reference paragraphs 1 through 86, inclusive, as though the same were more fully set forth at length.

88. Defendant, mBlox acting and/or failing to act as aforesaid, breached its contract and/or contractual relationship with plaintiff.

89. Plaintiff performed all conditions precedent required to have been performed pursuant to the Agreement, prior to the commencement of this action.

90. As a result of the breach, plaintiff sustained damages.

WHEREFORE, plaintiff, SD Alexander, Inc. demands judgment in its favor and against defendant, mBlox, Inc., formerly MobileSys, Inc., in an amount in excess of $75,000 exclusive of interest and costs, together with incidental and/or consequential damages,

23

**A29**

result thereof.

WHEREFORE, plaintiff, SD Alexander, Inc. demands judgment in its favor and against defendant, mBlox, Inc., formerly MobilSys, Inc., in an amount in excess of $75,000 exclusive of interest and costs, together with incidental and/or consequential damages, exemplary and/or punitive damages, interest, costs of suit, attorneys' fees and related costs as permitted by the Agreement, and such other relief as the court deems just.

## COUNT V

### Plaintiff v. mBlox, Inc.
### [Unjust Enrichment]

96.  Plaintiff incorporates herein by reference paragraphs 1 through 95, inclusive, as though the same were more fully set forth at length.

97.   As a direct and proximate result of the foregoing wrongful conduct, acts and/or omissions of defendant, mBlox, mBlox has intentionally, expressly and/or tacitly received a benefit, monetary or otherwise, that would be unconscionable and unfair for defendant, mBlox to retain.

98.  As a direct result of the aforesaid wrongful conduct, acts and/or omissions by defendant, mBlox, mBlox has been enriched to the detriment of plaintiff and injustice would result to plaintiff if recovery for the enrichment of mBlox is denied to plaintiff.

A30

WHEREFORE, plaintiff, SD Alexander, Inc. demands judgment in its favor and against defendant, mBlox, Inc., formerly MobileSys, Inc., in an amount in excess of $75,000 exclusive of interest and costs, together with incidental and/or consequential damages, exemplary and/or punitive damages, interest, costs of suit, attorneys' fees and related costs as permitted by the Agreement, and such other relief as the court deems just.

John M. LaRosa, Esquire
Delaware Bar No. 4275
Law Office of John M. LaRosa
Two East 7th Street, Suite 302
Wilmington, Delaware 19801
(302) 888-1290
Attorney for plaintiff,
SD Alexander, Inc.

Dated: May 17, 2004

26

A31

# NON-EXCLUSIVE SALES REPRESENTATIVE AGREEMENT

This Non-Exclusive Sales Representative Agreement ("Agreement"), made and effective this 1st day of April, 2003, by and between MobileSys, Inc., a Delaware corporation, having its principal place of business in Sunnyvale, California ("Company") and SD Alexander, Inc., a private held corporation, having its principal place of business in St. Petersburg, FL("Sales Representative").

WHEREAS, Sales Representative independently employs a sales force experienced in making sales of communications services and software and desires to act as an independent Sales Representative, and to provide services for Company, upon the terms and conditions set forth in this Agreement; and

WHEREAS, Company desires to appoint Sales Representative, and Sales Representative desires to accept appointment, as a non-exclusive, independent sales representative of Company's services and products as set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements promises set forth herein, Company and Sales Representative (collectively the "Parties") agree as follows:

## 1. Definitions

A.     The term "Products and Services" shall mean the Company Products and Services identified in Exhibit A, which may be amended from time to time by the mutual agreement of the Parties.

B.     The term "Territory" shall mean the geographic areas identified in Exhibit B, which may be amended from time to time by the mutual agreement of the Parties.

## 2. Rights Granted and Limitations.

A.     Company hereby appoints Sales Representative to be its non-exclusive, independent sales representative in the Territory for the purposes of selling and of providing certain administrative services in respect to Company Products and Services. Sales Representative hereby accepts such appointment. Sales Representative shall not appoint any sub-representative, subagent or distributor without obtaining the prior written consent of Company, which consent shall be granted or withheld in Company's sole discretion.

B.     Nothing herein shall prevent or prohibit Company from appointing other sales representatives to sell any of Company's Products and Services in the Territory or elsewhere, nor shall anything provided herein be deemed to prohibit the Company from selling its Products and Services directly to any customer or market segment, including but not limited to Wholesale and Retail Enterprise, Fortune 500, Manufacturing, Medical, Government, Telecommunications, and Content Provider customers.

1

**A32**

C.    Sales Representative shall have no authority, without the express written consent of Company, to bind Company to any contract, representation, understanding, act, or deed concerning Company or any Products or Services covered by this Agreement. Such consent may be granted or withheld in Company's sole discretion.

D.    This Agreement shall not be deemed to establish a joint venture, partnership, distributorship, franchise, or employment relationship between the Parties, and the Parties and each of them shall not represent to others that this Agreement or the performance hereof creates a joint venture, partnership, distributorship, franchise, or employment relationship between the Parties.

E.    Sales Representative shall make no warranties or representations concerning the Products and Services unless such warranties or representations are expressly authorized in writing by Company or are representations made in sales brochures or literature which are provided by Company to Sales Representative. Sales Representative shall make no representations concerning prices, terms of delivery, terms of payment, or conditions of sales, except to the extent such representations are specifically and expressly authorized in writing by Company.

F.    During the term of this Agreement and any extension hereof, Sales Representative shall not engage, either directly or indirectly, in the manufacture or sale of products or services that are similar to or competitive with the Products and Services covered by this Agreement and any extension hereof, unless Company and Sales Representative agree in advance in writing. This provision shall not apply following termination of this Agreement.

G.    During the term of this Agreement, Sales Representative shall not serve as a sales representative, sales agent, distributor, or sub-representative, subagent or sub-distributor of products or services of other entities which compete, directly or indirectly, with Company's Products and Services. This provision shall not apply following termination of this Agreement.

H.    In the event that Sales Representative becomes aware of or is contemplating a sales opportunity which Sale Representative believes may involve a non-competing product or service, but for which, with or without adaptation or modification, a Product or Service of Company could be employed as functionally equivalent, Sales Representative shall present the opportunity in writing to Company for its consideration. In the event that Company certifies in writing that the said sales opportunity is non-competing and Company does not wish to pursue it, Sales Representative may thereafter pursue the said sales opportunity with another provider. In the event that Company determines that the said sales opportunity is non-competing and Company wishes to pursue the opportunity, Sales Representative and Company shall work expeditiously and cooperatively to do the work necessary to prepare for and pursue the said sales opportunity. In the event that Company determines that the sales opportunity is

2

**A33**

competing, Sales Representative may not pursue it.

**3.      Duties of Sales Representative**

   A.      Sales Representative shall, at all times, use its best efforts to promote the sale of the Products and Services in the Territory.

   B.      Sales Representative shall keep itself informed of the condition of the market in the Territory and make available to Company any information essential to the marketing of Products and Services, in particular sales possibilities, pricing, trade statistics, competitive measures, and similar information, relating to the Territory. Sales Representative shall submit to Company a written report at least every month containing the data set forth in such forms as may be supplied by Company for that purpose. Such written reports shall be submitted at least every month during the term of this Agreement.

   C.      Company shall assist Sales Representative by giving advice in commercial and technical matters.

   D.      Company shall supply Sales Representative with reasonable quantities of advertising and promotional literature in connection with the Products and Services for sales purposes. Sales Representative shall not produce any advertising literature concerning Products and Services unless it has been expressly authorized to do so in writing by Company. Such authorization shall be made by prior submission of the proposed advertising literature to Company, and approval will be obtained only upon Company responding in writing that approval has been given for a particular submission by Sales Representative. No approval shall be deemed given due to any failure of the Company to respond to any such submission within any period of time. Approval when given applies only to the specific proposed items for which the approval is expressly given by Company, and no approval of other items shall be implied by approval of a particular item.

   E.      Sales Representative shall provide reasonable technical services deemed necessary by Company to enable purchasers and prospective purchasers to satisfactorily use the Products and Services in accordance with their particular needs.

**4. Products and Services.**

As used in this Agreement, the term "Products and Services" shall mean the products, services, and any related service parts and accessories created, manufactured and/or sold by Company as follows: MobileSys MX software, partner solutions software, and associated invoiced message traffic delivered through the MobileSys messaging network.

**5. Terms of Sale.**

All sales of the Products and Services by Sales Representative shall be made pursuant to

A34

this Agreement at such prices and on such terms as Company shall establish from time to time. Provided, however, that any change in an established price of a Product or Service shall be made on not less than thirty (30) days for premium service products or seven (7) days for basic service products written notice to Sales Representative. Any such notice of price change may be delivered by any of the following means: fax, email, regular mail, overnight delivery service, or messenger.

### 6. Commissions

A.    During the term of this Agreement, Company shall pay to Sales Representative, for all services provided or expenses incurred by Sales Representative, commissions as a percentage of the Net Sales of each separate order for delivery of Products and Services into the Territory that results directly from the efforts of Sales Representative and which order Company accepted for shipment or delivery into the Territory, calculated as provided in Section 6(C) below ("Qualified Sales"). As used herein, "Net Sales" means the invoice price of Products and Services sold less all discounts, allowances, purchase, sales, or other similar taxes, freight and insurance; and duties. The Company shall pay no commission to Sales Representative with respect to Products and Services sold by or as a result of the efforts of other sales representatives or distributors of Company or with respect to Products and Services sold by Company directly, or for Products and Services provided, shipped or delivered out of the Territory.

B.    Payment of commissions shall be made in U.S. dollars.

C.    Commission rates under this Agreement shall be as follows: Messages at fifteen percent (15%) of monthly invoice, except where otherwise expressly agreed in writing. Software Products paid at twenty percent (20%) of invoice (resale of MobileSys or any partner solutions specified in Exhibit A).

D.    Commissions will be paid monthly, based on monthly invoices on Qualified Sales, within forty-five days after the invoice is sent to the Qualified Sales customer. Chargebacks may be made as provided in Section 6(E) of this Agreement. A copy of each monthly invoice for Qualified Sales, together with the rate of commission applicable to each sale and information relating to any chargebacks, shall be provided to Sales Representative with the commission payment on such sales. Subsequent New Business obtained by Sales Representative from customers with existing or prior Qualified Sales, shall be paid at the rates set out in Section 6(C) of this Agreement. Subsequent New Business is measured as the contracted increase in Net Sales above the previous or existing contract with such customer. Repeat Business, defined a rebooking of business at the same or lesser level of invoiced amount following the initial contract term, is not Qualified Sales, and commissions will not be paid on Repeat Business.

E.    "Chargebacks" are any deduction(s) taken against the commissions earned by Sales Representative which are not required by state or federal law. Chargebacks which may be made by Company include: overpayment to Sales Representative by

4

Company of commissions; unused promotional or advertising funds or other funds advanced to Sales Representative or on Sales Representative's behalf by Company; commissions on invoices unpaid by customers on Qualified Sales and deemed uncollectable by Company in its sole discretion; and commissions on services for which service credits are given to customers, in Company's sole discretion, to induce such customers to continue their existing contractual commitments.   A chargeback will be withheld from the next commission payment(s) due to Sales Representative until fully repaid.  If there is insufficient commission activity to repay the amount of the chargeback in full within ninety (90) days after Company gives Sales Representative initial notice of a chargeback, Sales Representative shall remit the balance to the Company within ten (10) days of the Company's written notice thereof to Sales Representative.

### 7. Marketing Policies.

Sales Representative will at all times promote vigorously and effectively the sale of Company's Products and Services in the Territory, in a manner consistent with Company's established policies.  Sales Representative will use its best efforts to identify and sell Company's Products and Services to qualified, reputable, and financially responsible retail and wholesale customers in the Territory. Sales Representative is authorized to obtain signatures of such customers and take orders from such customers on forms provided by Company for such purpose, relating to the purchase, resale and service of Company's Products and Services.  However, Sales Representative is not authorized to sign any contract or order on behalf of Company, and no contract shall be binding on Company until and unless approved and signed by Company.  Company may deny such approval for any contract or order, in its sole discretion.  Sales Representative shall concentrate its marketing of the Company's Products in the Territory.

### 8. Merchandising Policies.

In its sole discretion, Company may provide Sales Representative with merchandising assistance from time to time in the form of advertising programs, product and sales training and sales promotions.

### 9. Advertising Policies.

Company will provide such advertising of the Products and Services in the Territory as Company, in its sole judgment, deems necessary and appropriate.  Sales Representative is not relying on Company committing to any level of advertising of the Products and Services as a term or condition of entering into this Agreement.  However, Sales Representative shall cooperate with Company in any advertising and promotion of the Products and Services in the Territory, and Sales Representative agrees to participate in and comply with the terms and conditions of such advertising programs as Company may establish and offer from time to time.  Nothing herein shall prevent Sales Representative from independently advertising the Products and Services, subject however to a requirement that Company expressly approves the form and content of the advertising or

5

A36

marketing materials in writing in advance of any use or publication thereof.

**10. Product Warranty Policies.**

Sales Representative shall not promise or advertise any warranty to customers and prospective customers which is not expressly authorized by Company.

**11. Indemnification.**

A.       Each Party agrees to protect and hold the other Party harmless from any loss or claim arising out of the negligence of the negligent Party or its agents, employees or representatives in the performance of its duties under this Agreement, and from any loss or claim of a third party arising from the breaching Party's breach of this Agreement. Sales Representative agrees to protect Company and hold Company harmless from any loss or claim arising out of any representation or warranty made by Sales Representative, its agents, employees or representatives with respect to Company's Products and Services that exceeds any warranty offered by Company.,

B.       In addition, Sales Representative acknowledges hereby represents to Company that: Sales Representative has its own sales force, who are employees of Sales Representative; that Sales Representative complies and will comply with all laws applicable to its employment of such sales employees; that Sales Representative provides independent sales representative services to entities other than Company; that Sales Representative has its own place of business which it utilizes to provide sales representative services to various entities; and that Sales Representative is qualified and capable to undertake its responsibilities under this Agreement without detailed supervision by Company.  Sales Representative agrees to protect Company and hold Company harmless from any loss or claim of Sales Representative's employees or any governmental agency arising in whole or in part from Sales Representative's breach of these representations or any of them.

**12. Use of Company's Name.**

Sales Representative shall have no rights (other than the description of the Products and Services in the course of the sale thereof) to use the corporate name of Company, or to use any trademarks or trade names of Company, except as Company may expressly approve in writing. Sales Representative may state and represent that it is an authorized independent sales representative of the Products and Services of the Company. Sales Representative will not use, authorize or permit the use of, the name "MobileSys, Inc." or "MobileSys" or any other trademark or trade name owned by Company as part of its firm, corporate or business name in any way. Sales Representative shall not contest the right of Company to exclusive use of any trademark or trade name used or claimed by Company. Sales Representative agrees that it will not register, or cause to be registered, in the Territory or elsewhere, any trademark or trade name utilized by Company in connection with its products, or any other trade name, trademark, word, or symbol that is

6

A37

identical or similar to any trademark or trade name owned or utilized by Company. Upon termination of this Agreement for any reason, Sales Representative agrees immediately to discontinue all uses of Company's corporate name, trademarks, or trade names, and shall immediately discontinue any and all representations, direct or implied, that it is or was a sales representative of Company.

### 13. Relationship of the Parties.

Sales Representative is an independent contractor. Sales Representative, its agents and employees shall, under no circumstances, be deemed employees or agents of Company. Sales Representative will not modify or permit the modification of any of Company's Products and Services. Neither Company nor Sales Representative shall have any right to enter into any contract or commitment in the name of, or on behalf of the other, or to bind the other in any respect whatsoever.

### 14. Term and Termination.

A.    Unless earlier terminated as provided below, the term of this Agreement shall commence on May 15, 2003 and shall continue until May 15, 2004. At the end of the term, the Agreement shall continue until terminated by either party on at least sixty (60) days prior notice.

B.    Company may terminate at any time by written notice given to Sales Representative not less than ninety (90) days prior to the effective date of such notice in the event Company decides to terminate all outstanding independent sales representative agreements for Company's Products and Services and to offer a new or amended form of independent sales representative agreement.

C.    Company may terminate this Agreement upon notice to Sales Representative, upon any of the following events: (1) failure of Sales Representative to fulfill or perform any one of the duties, obligations or responsibilities of Sales Representative in this Agreement, which failure is not cured within twenty (20) days after notice from Company; (2) any assignment or attempted assignment by Sales Representative of any interest in this agreement or delegation of Sales Representative's obligations under this Agreement without Company's express written consent; (3) any sale, transfer or relinquishment, voluntary or involuntary, by operation of law or otherwise, of any material interest in the direct or indirect ownership or any change in the management of Sales Representative; (4) failure of Sales Representative for any reason to function in the ordinary course of business; (5) conviction in a court of competent jurisdiction of Sales Representative, or a manager, partner, principal officer or major stockholder of Sales Representative for any violation of law tending, in Company's sole opinion, to affect adversely the operation or business of Company or the good name, goodwill, or reputation of Company, the Products or Services of Company, or Sales Representative; or (6) submission by Sales Representative to Company of false or fraudulent reports or statements, including, without limitation, claims for any refund,

7

credit, rebate, incentive, allowance, discount, reimbursement or other payment by Company.

**15. Obligations on Termination.**

On termination of this Agreement, Sales Representative shall cease to be an authorized sales representative of Company, and all amounts owing by Sales Representative to Company, if any, shall become immediately due and payable. Following termination, Sales Representative will be entitled to payment on each existing Qualified Sales contract, if any, until the expiration of the then current term of each contract on which commissions would have been payable had this Agreement not been terminated, subject to the provisions of Section 6 of this Agreement.

**16. Confidentiality**

Sales Representative shall keep Company's business and trade secrets, including but not limited to customer, supplier, logistical, financial, research, and development information, strictly confidential and shall not disclose them to any third party during the term of this Agreement and for five years after the termination of this Agreement without the express written consent of Company.

**17. Legal and Regulatory Compliance**

A.     Sales Representative shall be solely and fully responsible for compliance with all the legal provisions and official rules in force in the Territory, including but not limited to telemarketing and do-not-call laws and rules. Sales Representative will advise Company of any laws in the Territory applicable to Company or the Products and Services.

B.     Sales Representative agrees at all times to comply with all United States laws or regulations, as they may exist from time to time, regarding export licenses or the control or regulation of exportation or re-exportation of products or technical data, including but not limited to software.

C.     Sales Representative shall have sole responsibility for compensation of its own employees and compliance with laws and regulations applicable to its business.

**18. Force Majeure.**

"Force Majeure" shall mean a cause of any kind not reasonably within the control of the party by whom an obligation or a condition must be fulfilled, and which could not have been prevented through the exercise of ordinary care by such party, including, without limitation, the following: acts of God, severe weather, fire, strikes and any other industrial, civil or public disturbance, and any laws, orders, rules, regulations (including export controls), failure or insufficiency of power or networks of third parties, war,

8

terrorist acts, insurrection, riots, and acts or restraints of any government or governmental body or authority, civil or military. If either Party to this Agreement is rendered unable, wholly or in part, by Force Majeure, to fulfill any obligation or condition of this Agreement, then upon giving notice and reasonably full particulars to the other Party, such obligation or condition, other than the obligation to pay money when due, shall be suspended, to the extent fulfillment is impeded, from the date of such notice until Force Majeure ceases or abates sufficiently to permit full or partial performance, and such Party shall be relieved of liability and shall suffer no prejudice under this Purchase Agreement for failure to perform the same during such period.

19. Acknowledgments.

Each Party acknowledges that no representation or statement, and no understanding or agreement, has been made, or exists, and that in entering into this Agreement each Party has not relied on anything done or said or on any presumption in fact or in law, (1) with respect to this Agreement, or to the duration, termination or renewal of this Agreement, or with respect to the relationship between the Parties, other than as expressly set forth in this Agreement; or (2) that in any way tends to change or modify the terms, or any of them, of this Agreement or to prevent this Agreement becoming effective; or (3) that in any way affects or relates to the subject matter hereof. Sales Representative also acknowledges that it has had the opportunity to review this Agreement with counsel of its choice, and that the terms and conditions of this Agreement, and each of them, are reasonable and fair and equitable.

20. Final Agreement.

This Agreement constitutes the entire understanding and agreement of the Parties hereto with respect to the subject matter hereof. This Agreement supercedes all prior and contemporaneous agreements, representations and understandings between the Parties regarding the subject matter hereof. This Agreement may be amended only by a writing signed by both parties.

21. Assignment.

Sales Representative may assign neither this Agreement nor any interest in this Agreement without the prior express written approval of Company, which may be withheld by Company at Company's sole and absolute discretion.

22. No Implied Waivers.

Waiver by either party, or failure by either party to claim a default, of any provision of this Agreement shall not be a waiver of any default or subsequent default.

9

## 23. Notices.

Any notice required by this Agreement or given in connection with it, shall be in writing and shall be given to the appropriate party by personal delivery or by certified mail, postage prepaid, or recognized overnight delivery services;

If to Company:

MobileSys, Inc.
485 East Evelyn Avenue,
Sunnyvale, CA 94086

If to Sales Representative:

SD Alexander, Inc.
370 Pinellas Bayway unit G
St. Petersburg, Florida 33715

And:

Barry Wilkinson, P.A.
696 First Avenue North Suite 201
St. Petersburg, Florida 33701-3649

## 24. Governing Law and Forum, Attorney's Fees.

A.    This Agreement is made under and is governed by and shall be construed in accordance with the laws of the State of California, United States of America, irrespective of its choice of law or conflict of law principles. Any dispute of any kind arising out of or relating to the Agreement shall be brought exclusively in the Delaware State courts. The United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

B.    In connection with any efforts by either Party to enforce this Agreement, including pre-trial enforcement efforts, and in litigation arising out of or relating to this Agreement, the prevailing Party shall be entitled to recover all costs incurred, including reasonable attorneys' fees for such litigation and any subsequent appeals thereof, whether or not litigation is actually commenced by a Party filing a complaint or petition in a court of law or equity.

## 25. Severability.

If a court of competent jurisdiction to be invalid or unenforceable, then this Agreement,

10

A41

holds any term of this Agreement including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

**26. Survival of Terms.**

The following provisions shall survive any expiration or termination of this Agreement: 1, 4, 6, 11, 12, 13, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, and 27.

**27. Headings.**

Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

**28. Receipt of Agreement**

By its signature below, Sales Representative hereby acknowledges receipt of a signed copy of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

MobileSys, Inc.                                    SD Alexander, Inc.

By: _____                               By: _____
Craig Levy                                         Scott D. Alexander
Head of Sales Americas

11

A42

**Exhibit A**

**Products and Services**

A43

**Exhibit B**

**Territory**

13

# Exhibit B through Exhibit S to the Affidavit of Tomas Hasler have been redacted in their entirety.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

S.D. ALEXANDER, INC.,                    )
a Florida corporation,                   )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )    C.A. No. 04-312-KAJ
                                         )
mBLOX, INC.,                             )
a Delaware corporation,                  )
                                         )
                    Defendant.           )

## AFFIDAVIT OF AMY A. QUINLAN

STATE OF DELAWARE        )
                         )  SS.
NEW CASTLE COUNTY        )

    1.      I am counsel for mBlox, Inc. in the above-captioned matter.

    2.      Attached as Exhibit A is a true and correct copy of excerpts of the
deposition of Scott Alexander given on April 18-19, 2005.

                              _____
                              Amy A. Quinlan

    SWORN TO AND SUBSCRIBED before me, a Notary Public, this 22nd day of
April, 2005.

                              _____
                              Notary Public

                              **DONNA B. PETCHEL**
                              **NOTARY PUBLIC**
                              **STATE OF DELAWARE**
                              **My Commission Expires Sept. 30, 2007**

1138896

**A190**

# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

S.D. ALEXANDER, INC.,           )
a Florida corporation,          )
                                )
            Plaintiff,           )
                                )  C.A. No. 04-312-KAJ
v.                              )
                                )
mBLOX, INC., formerly           )
a Delaware corporation,         )
                                )
            Defendant.          )


        Deposition of SCOTT D. ALEXANDER taken
pursuant to notice at the law offices of Morris, James,
Hitchens & Williams, LLP, 222 Delaware Avenue,
10th Floor, Wilmington, Delaware, beginning at
10:10 a.m., on Monday, April 18, 2005, before
Patricia L. Shelton, Registered Professional Reporter
and Notary Public.


APPEARANCES:

        J. STEPHEN WOODSIDE, ESQ.
        LAW OFFICE OF J. STEPHEN WOODSIDE, ESQ.
          The First Union Building
          123 South Broad Street - Suite 1815
          Philadelphia, Pennsylvania  19109
          for the Plaintiff

        AMY A. QUINLAN, ESQ.
        MORRIS JAMES HITCHENS & WILLIAMS, LLP
          222 Delaware Avenue - 10th Floor
          Wilmington, Delaware  19801
          for the Defendant


                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477

1    provided was for a lot of their old products.  So it

2    almost didn't apply to the new way.  Their contract was

3    for products, software products.  So, yes, there were

4    some modifications that were made to that.

5        Q.    And you referenced before a discussion about

6    commissions being paid after your relationship with mBlox

7    or MobileSys.  And correct me if I am wrong, but I think

8    you also said that the initial draft didn't contain a

9    provision that addressed that issue?

10       A.    I don't recall.  I don't recall if it had it and

11   it wasn't clear or if it didn't have it at all.

12       Q.    But the way that the contract reads now with

13   regard to how commissions will be paid following

14   termination, you had input on?

15       A.    Yes.

16       Q.    And what is your understanding of the way -- of

17   the nature of that provision?

18       A.    Upon termination or expiration, I would continue

19   to receive a revenue stream based on my commissions for

20   each client that I brought to them, as well as any add-on

21   services that mBlox provides these customers.

22       Q.    What would the end point be?

23       A.    There was no end point.

24       Q.    Meaning it would continue forever?

1      A.     Yes.

2      Q.     So say that the contract was terminated on

3    May 15th at the end of the original contract term, your

4    contract.   And -- just pulling one off the top of my

5    head, 9 Square, for instance, ten years later, you're not

6    working for mBlox.   You'd still be entitled to

7    commission?

8      A.     Correct.

9      Q.     And say that that contract that MobileSys has

10   with 9 Square, you're terminated on the 15th of May,

11   2004, at the end of your term, and there are add-ons that

12   are negotiated and signed by another sales rep that's

13   been assigned to that contract.   Are you entitled to

14   commissions on those add-ons as well?

15     A.     Correct.

16     Q.     And what's the basis for that?

17     A.     The contract.

18     Q.     What provisions in particular?

19     A.     I don't know.

20     Q.     But the language of the contract would provide

21   you that ability?

22     A.     Yes.

23     Q.     Were there other provisions of the contract that

24   you remember having negotiations with Mr. Levy about?

1    clients.  I like to be included on e-mail between the

2    technical staff so I can make sure the technical staff

3    responds in a reasonable time frame.  Make sure -- I tend

4    to stick with my customers and make sure there's -- ask

5    in advance, Are you having any problems?  Is there

6    anything I can do to help move things, get things moving

7    faster?

8              And they would always come back, well,

9    here's one, two, three, four that we need.

10              And, you know, is there any countries you're

11   looking at to get service to, provided to?  I mean, just

12   moving with them.

13   Q.    Did you spend a significant amount of effort as

14   account manager for your various accounts?

15              MR. WOODSIDE:  What's that mean?  What do

16   you mean by "significant"?

17   BY MS. QUINLAN:

18   Q.    How much time did you spend managing accounts?

19   A.    Depends on how much -- how much problem we had.

20   If the account wasn't a happy account, then I usually

21   spent more time with it.  If they were happy, then I

22   spent less.

23   Q.    Did you ever have accounts where you signed the

24   contract and had no more involvement with that account?

Scott D. Alexander                              124

1    A.    No.

2    Q.    So there was a constant effort or a continuing

3    effort with --

4    A.    I was involved.

5    Q.    Involved with each of these accounts after

6    contract?

7    A.    Correct.

8          I was -- like I was involved with SMS.AC

9    after that contract was signed.  Working on pricing with

10   other countries.  Working on, you know, pricing for

11   premium SMS, moving forward with different products.

12   Q.    By moving forward with different products, do you

13   mean what you have referred to in some of your stuff as

14   add-ons?

15   A.    Yes.

16   Q.    And an add on would be what?

17   A.    Would be -- in some instances, mBlox would

18   contract a particular country at a particular price.  So

19   an add on would be another country.  Same contract, just

20   a different add on.  I forget what they termed it.  They

21   termed it something.  But it would just be an agreement

22   to deliver, say, to Romania and U.K. was the initial

23   request.  And then the next request is they want to send

24   to, you know, Holland.

1    Q.    With regard to these add-ons, was it typical that

2    an account would ask for additional add-ons or is that

3    something that needed to be sold to them?

4    A.    Both.

5    Q.    Both.

6          How were you paid for your services as an

7    account manager?

8    A.    Through my commissions.

9    Q.    So the commissions that you received on your

10    sales agreement, on your non-exclusive sales

11    representative agreement included your services as an

12    account manager as well?

13    A.    Yes.

14    Q.    Do you know if that was typical for other sales

15    representatives inside the organization?

16    A.    No.

17          I mean, keep in mind with MobileSys, there

18    were no account managers.  If you wanted your account to

19    be happy, you stayed with it and made sure that their

20    issues were resolved.

21          And that was the same with mBlox, too.

22    Although they had account managers, they weren't on any

23    of my accounts that I knew of.  Or, they weren't talking

24    to me at any point.

Scott D. Alexander                    126

1    Q.    So it was up to you to keep your client happy

2   acting as an account manager post contract?

3    A.    Yes.

4    Q.    Did you ever partake in any negotiations with the

5   accounts on the various contracts that they signed?

6    A.    Yes.

7    Q.    What would you do?  What was your participation?

8    A.    Well, in just every case -- most of the contracts

9   we signed, some people wanted modifications to the

10  contract, little things about, you know, possibly support

11  or 24/7 support or stuff like that.  But most of it all

12  was wrapped around pricing.  The contracts were just --

13  especially with MobileSys were just general network

14  agreements, how the two companies will work together.

15  And then pricing was usually what you would negotiate.

16   Q.    So can you give me an estimate on what percentage

17  of your time you would spend post contract with accounts?

18   A.    Well, like I said, it would vary depending on the

19  complexity of the account.

20   Q.    Can you give me an example of an account --

21   A.    An example of SMS.AC, negotiated and worked with

22  them for, jeez, it seemed like six weeks.  And that

23  consumed easily 50 percent of my day.

24          With a company like Zingy, they weren't

### CERTIFICATE OF SERVICE

I, Matthew F. Lintner, hereby certify that on this 29th day of April, 2005, I caused

to be electronically filed the public version of the Appendix in Support of Defendant mBlox,

Inc.'s Opening Brief in Support of Motion for Partial Summary Judgment with the Clerk of the

Court using CM/ECF, which will send notification of such filing to the following:

John M. LaRosa, Esquire
Law Office of John M. LaRosa
Two East 7th Street, Suite 302
Wilmington, DE  19801


Additionally, I caused to be hand delivered two copies of the public version of the

Appendix in Support of Defendant mBlox, Inc.'s Opening Brief in Support of Motion for Partial

Summary Judgment to the following:

John M. LaRosa, Esquire
Law Office of John M. LaRosa
Two East 7th Street, Suite 302
Wilmington, DE  19801


_Matthew F. Lintner (#4371)_
Matthew F. Lintner (#4371)
Amy A. Quinlan, Esquire (#3021)
MORRIS JAMES HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
302.888.6800
mlintner@morrisjames.com
aquinlan@morrisjames.com
Attorneys for Defendant mBlox, Inc.

1162904